**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

UNITED STATES OF AMERICA,

Plaintiff,

vs. **Case No. 03-40144-01/02-RDR**

KENNETH LYONS and
LETTY DELORES SIERRA-DE-MALDONADO,

Defendants.

______________________________

**MEMORANDUM AND ORDER**

This case arises from a traffic stop on I-70 in Geary County. The traffic stop occurred at night on December 11, 2003. Defendant Lyons was driving a white Chevrolet Blazer. Defendant de Maldonado was a passenger in the vehicle. Kansas Highway Patrol Trooper Jared Ranieri made the stop and was assisted by Highway Patrol Trooper Dean. The government asserts that the traffic stop raised a suspicion that the vehicle contained illegal narcotics and that as a result of a consent search, packages of cocaine were found in the spare tire of the Blazer.

Each defendant has filed a motion to suppress. The motions raise very similar arguments. In addition, defendant Lyons has filed a motion to dismiss which raises a speedy trial issue.

MOTIONS TO SUPPRESS

Trooper Ranieri testified before the court regarding the

events on December 11, 2003. Trooper Ranieri started his career as a Kansas Highway Patrol Trooper in July of 2000. Prior to making the stop in this case, he had been involved in numerous drug seizures from vehicles including several from hidden compartments as well as spare tires. He has had training on drug interdiction, trends in drug smuggling and indicators of drug smuggling. He has also examined photographs from other drug interdiction officers who have made drug seizures from vehicles. Trooper Ranieri testified that it was very common to hide drugs in a spare tire.

During the night of December 11, 2003, Trooper Ranieri was parked in his patrol car in the median of I-70 in Geary County, Kansas. Where he was parked, the westbound lanes were below the eastbound lanes. His position in the median was somewhat below the eastbound lanes, and his lights were shining up in a diagonal direction toward the eastbound lanes. Trooper Dean was in a separate car facing the same direction with his lights shining as well. There were no other lights in the area.

The weather was cold and dry, but the day before it had been snowy and rainy and road crews had been treating the highways.

Trooper Ranieri testified that he saw a white Chevrolet Blazer driving east and immediately noticed what he considered suspicious indications of drug smuggling. Specifically, he

noticed that the spare tire, which was carried underneath the back of the vehicle, was clean and oversized. The Blazer was quite dirty, which was consistent with the road conditions the day before. But, Ranieri said the spare tire was so clean that he immediately suspected that it contained illegal drugs.

Trooper Ranieri traveled out of the median and caught up with the Blazer. He tried to read the license plate but found it difficult because of the dirt and grime on the tag. He had to approach to within five feet of the tag before he could read it, and even then he could not read the registration sticker. Ranieri also noticed that the spare tire was hanging lower than normal for that kind of vehicle. He decided to stop the vehicle because he suspected that it was carrying drugs in the spare tire and because the license plate and registration sticker were too dirty to read in violation of K.S.A. 8-133. This statute requires that a license plate be "clearly visible" and "maintained free from foreign materials and in a condition to be clearly legible."

Defendant Lyons was the driver of the Blazer. Defendant de Maldonado was riding in the front passenger seat. Trooper Ranieri stated that after stopping the Blazer, he walked up to the rear of the vehicle and wiped away grime from the top of the tag where the registration stickers were affixed. Then, he

approached the front of the vehicle, asked defendants for their licenses or identification, and told them they were being stopped because their license plate was too dirty to read. Defendants told Ranieri that they had rented the Blazer and were returning to Florida after visiting Denver on vacation.

As he returned to his patrol car, Ranieri again checked the spare tire of the Blazer. He noticed that it looked clean while the rim of the spare tire looked dirty and salty. He saw fingerprints on the tire and noticed the bead was scarred with tool marks. He observed that the spare tire was a different brand than the other tires on the Blazer and that it was a larger size than the other tires. He thought this was particularly unusual for a rental vehicle.

Upon doing a criminal history check on defendant Lyons, Ranieri discovered that Lyons had a prior drug possession and drug trafficking conviction.

Ranieri returned to the Blazer to give defendant Lyons a warning ticket and to return his driver's license and any other documents. He told Lyons that a warning ticket was being issued and that he had wiped part of the tag clean. He told Lyons to have a safe trip and started to step back from the vehicle when he was asked where the nearest car wash was. Ranieri replied that it would be at Topeka which was forty minutes away.

Ranieri said, "Thanks," and for an instant he stepped back again, but then stated that he noticed that Lyons had a criminal history and asked whether defendants had anything illegal in the vehicle like cocaine or marijuana. Lyons said "No," and Ranieri asked if Lyons would mind if Ranieri looked "in the back." Lyons said, "Go ahead."

After Ranieri and Dean patted down the two defendants, Ranieri began to look in the back of the vehicle. As he started this process, he used his hand-held radio to cancel a request he had made for a drug dog to be transported to the site of the stop. Mainly, Ranieri was looking for tools to lower the spare tire. He did not find them, but he noticed four cans of "fix-a-flat" which further heightened his suspicions. Ranieri decided to check the spare tire with a stethoscope. This involved listening to the tire with the stethoscope while striking the tire. Ranieri stated that he heard a low thud which he said was indicative of contraband being stored in the spare tire. Ranieri had used a stethoscope before to detect contraband in a tire. He had Trooper Dean listen to the spare tire and one of the regular tires with the stethoscope to illustrate the difference.

The troopers could not determine how to lower the spare tire, so Ranieri asked Lyons where the tools for the spare tire

were. Lyons hesitated and said he didn't know. Ranieri explained that he thought there was contraband in the spare tire. Ranieri found the tools under the back passenger seat of the Blazer and used them to lower the spare tire. He could tell that the spare tire had been raised and lowered frequently. The tire was so heavy that the vehicle raised up when it was lowered to the ground. After cutting the spare tire open, the troopers found contraband and arrested the defendants. This was close to thirty minutes after the traffic stop was initiated.

There is a videotape recording of the stop. However, the tape has not recorded approximately the first minute of the traffic stop when, according to Ranieri's testimony, he wiped the top of the license plate and then approached the driver's side of the Blazer. Ranieri explained that the delay in videotaping occurred because before the traffic stop he had been watching tape of a previous stop and the camera had to fast forward automatically to a "clean" part of the tape before it could begin recording the stop of the Blazer. Additionally, Ranieri did not activate his microphone until he approached the Blazer the second time to hand Lyons the warning ticket and other documents. There is no audio on the recording until that point in the traffic stop.

Still pictures have been admitted into evidence and the

court has examined the videotape. As counsel for defendant Lyons has stated, on the videotape one cannot see underneath any vehicle passing by the scene of the traffic stop in the eastbound lanes of I-70. But, neither the camera nor the patrol car headlights are pointed toward the passing vehicles. For this reason we disagree with defendants' contention that Ranieri did not or could not see the spare tire while the Blazer was traveling on I-70.

The videotape records the license plate of the Blazer at rest during the traffic stop a few feet in front of the patrol car with the lights of the patrol car directly on it. Still pictures of the license plate have also been taken from close range under different light conditions than existed on I-70 prior to the traffic stop. Again, we do not believe this evidence disproves Ranieri's statements that the license plate was dirty, did not reflect light, and was not "clearly legible" as he observed it while following the Blazer on I-70. The still pictures do support Ranieri's testimony that he wiped the top part of the license plate where the registration stickers are placed.

The still pictures also show that the spare tire was not conspicuously clean when the pictures were taken. However, the still pictures were taken after the spare tire had been removed

from the Blazer, placed on the roadside, manipulated and cut open, rolled to another vehicle, taken to a shop and further handled on a dirty shop floor. We are not convinced by the still pictures that the spare tire did not look clean when Ranieri first examined it on the Blazer.

It is clear from Ranieri's actions during the traffic stop that he was suspicious from the outset that contraband was being carried in the spare tire of the Blazer. This supports the credibility of his testimony regarding his observations.

The motions to suppress raise the following issues:

1. Was there a legal reason for the traffic stop? The court finds that Trooper Ranieri was a credible witness. We believe his observations provided legitimate grounds for stopping defendants' vehicle on suspicion of a violation of K.S.A. 8-133. Reasonable suspicion of a traffic violation is the requirement for a legal traffic stop.

> Reasonable suspicion requires that an officer provide some minimal level of objective justification. However, an officer with reasonable suspicion need not rule out the possibility of innocent conduct as long as the totality of the circumstances suffices to form a particularized need and objective basis for a traffic stop. Moreover, reasonable suspicion may be supported by an objectively reasonable good faith belief even if premised on factual error. Finally, reasonable suspicion may rely on information less reliable than that required to show probable cause and it need not be correct.

U.S. v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004) (interior

citations and quotations omitted). The court believes the difference in the appearance of the license plate where Ranieri wiped it clean and where it was not wiped clean, supports his testimony that the license plate was not, in the language of K.S.A. 8-133, "clearly visible" and "maintained free from foreign materials and in a condition to be clearly legible." There was a reasonable suspicion of a traffic violation to support the stop of the Blazer. See also U.S. v. Granados-Orozco, 2003 WL 22213129 (D.Kan. Aug. 26, 2003).

2) Were defendants detained too long after the license plate and registration sticker were determined to be valid?

Relying of the case of U.S. v. McSwain, 29 F.3d 558 (10th Cir. 1994), defendants contend that the traffic stop should have ceased after Ranieri verified that the registration sticker had not expired. In McSwain, the Tenth Circuit held that when there was a traffic stop to verify the validity of a temporary tag, the stop should have been terminated after it was discerned that the temporary tag was valid. The government argues that McSwain is distinguishable because in McSwain no traffic law violation was found, while in the instant case there was a traffic law violation - the dirty registration sticker. The government cites an unpublished Tenth Circuit opinion, U.S. v. Poke, 2003 WL 22701661 (10th Cir. 11/17/03) that refers to language in

McSwain which distinguishes that case from those "situations in which the officer, at the time he or she asks questions or requests the driver's license and registration, still has some objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring." 29 F.3d at 561. That distinction was also made by the Tenth Circuit in the recent case of U.S. v. DeGasso, 369 F.3d 1139, 1149 (10th Cir. 2004). We believe the case at bar is distinguishable from McSwain on the same basis.

3. Were defendants unlawfully detained after their licenses or other documents were returned?

Defendants assert that they were illegally detained and questioned after the return of the driver's license and other documents to defendant Lyons.

The government contends that any further questioning was consensual and that the highway patrol troopers had a reasonable suspicion of illegal activity.

The court finds that there was a consensual encounter between Trooper Ranieri and defendants after he told defendants to "have a safe trip," and started to step back from the car. He and Trooper Dean did not display a threatening presence. They did not brandish weapons or physically touch defendants. They did not speak in a commanding fashion. They did not retain

defendants' documents or other personal effects. As soon as Trooper Ranieri bid defendants a safe trip, defendants inquired about the location of a car wash. Thus, defendants extended the encounter. Trooper Ranieri testified that he did not intend to permit defendants to leave, but he did not communicate that intention to defendants.

"A traffic stop may become a consensual encounter if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." U.S. v. Hernandez, 93 F.3d 1493, 1498 (10th Cir. 1996). In deciding whether a police-citizen encounter amounts to a seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Florida v. Bostwick, 501 U.S. 429, 437 (1991) (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)). "A person is seized only when that person has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way." Hernandez, 93 F.3d at 1498. We believe defendants had no objective reason to believe that they were required to remain. Therefore, we find that the troopers did not compel defendants to stay or answer

questions after Trooper Ranieri returned their documents and told them to have a safe trip.

Even if there was a "seizure" under constitutional analysis and the encounter was not consensual after the business of the traffic stop was completed, the court finds that reasonable suspicion supported the extension of the defendants' alleged detention. An investigative detention must be supported by an objectively reasonable suspicion of illegal activity based on the totality of the circumstances. U.S. v. Sokolow, 490 U.S. 1, 8 (1989). This is based upon the "perspective of the reasonable officer not the reasonable person." U.S. v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003). Officers may draw on their own experience and training to make inferences and deductions. Id. Deference is given to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances. U.S. v. McRae, 81 F.3d 1528, 1534 (10th Cir. 1996).

Prior to the time that Trooper Ranieri returned defendant Lyons' driver's license and other documents, he had an objectively reasonable suspicion that illegal drugs were being transported in the Blazer. He knew that the Blazer was a rental vehicle traveling east on I-70. He knew the spare tire was a different brand and a larger size than the tires on the four

wheels. The spare tire looked suspiciously clean and appeared to be carried lower on the vehicle than normal. It had fingerprints and tool marks on it. Ranieri knew that spare tires are often used to smuggle drugs. He knew that defendant Lyons had a criminal history for drug possession and trafficking. In addition, Ranieri noticed a radar detector in the vehicle and thought he smelled air freshener.

Under these circumstances, the court believes Ranieri had sufficient grounds to continue defendants' detention to ask questions relevant to drug transportation and to request consent to search the vehicle. Cf., U.S. v. Arango, 912 F.2d 441, 446-47 (10th Cir. 1990) cert. denied, 499 U.S. 924 (1991) (absence of proof of authority to operate vehicle and inadequate luggage in truck for alleged two-week vacation provides reasonable grounds to continue detention to inquire whether truck was carrying contraband and whether driver would consent to a search).

4. Did defendants consent to the search that was conducted?

Defendants assert that they did not give a valid consent to search and that the search exceeded the scope of whatever consent may have been given.

In response to the request for consent to search "in the back" of the vehicle, defendant Lyons said, "Go ahead." This was a clear and unequivocal consent to search the back of the

Blazer.

The Tenth Circuit has explicated the standards applied to challenges to the scope of a search in U.S. v. Elliott, 107 F.3d 810, 814-15 (10th Cir. 1997):

> The scope of a search "is generally defined by its expressed object," Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991), and "is limited by the breadth of the consent given." United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996)(quoting United States v. Pena, 920 F.2d 1509, 1514 (10th Cir. 1990), cert. denied, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness–-what would the typical reasonable person have understood by the exchange between the officer and the suspect." Jimeno, 500 U.S. at 251, 111 S.Ct. at 1803-04.

We believe that a reasonable person would consider a consent to a search "in the back" of a vehicle to include an examination of the spare tire underneath the rear. This finding is supported by defendants' failure to object. Trooper Ranieri inquired about the tire tools and explained his suspicions, but defendants did not object to the troopers finding and using the tire tools to lower the spare tire. The failure to object may be considered evidence that the search was within the scope of the consent. U.S. v. Pena, 143 F.3d 1363, 1368 (10th Cir. 1998); U.S. v. Anderson, 114 F.3d 1059, 1065 (10th Cir. 1997).

Moreover, the troopers' examination of the spare tire underneath the back of the Blazer did not require consent. The

visual examination of the exterior of a vehicle is not a "search" for constitutional purposes. New York v. Class, 475 U.S. 106, 114 (1986). "The undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy." U.S. v. Rascon-Ortiz, 994 F.2d 749, 754 (10th Cir. 1993). See also, U.S. v. Gonzalez-Acosta, 989 F.2d 384, 388 (10th Cir. 1993) (it does not constitute a "search" to squat down with a mirror and flashlight to see shiny bolts on the gas tank support straps underneath of vehicle).

Additionally, when the troopers made their search of the back, they saw the cans of "fix-a-flat" and used a stethoscope which confirmed their suspicions that the spare tire contained contraband. At this juncture they had probable cause to search the spare tire and did not need consent to justify lowering the tire and cutting it open. See U.S. v. Soto, 988 F.2d 1548, 1558 (10th Cir. 1993) (evidence of secret compartment in vehicle justifies arrest and removal from scene of detention); U.S. v. Toro-Pelaez, 893 F.Supp. 963, 966 (D.Kan. 1995) aff'd, 107 F.3d 819 (10th Cir.) cert. denied, 522 U.S. 845 (1997) (citing five cases for proposition that finding secret compartment in vehicle provides probable cause to arrest).

After a careful consideration of the circumstances in this case, the court believes the search of the Blazer as conducted

by the troopers was not unconstitutional.

MOTION TO DISMISS

Defendant Lyons has filed a motion to dismiss “for prejudicial post-indictment delay.”

Defendant Lyons was arrested on state charges after the traffic stop in this case on December 11, 2003. He posted bond and then absconded. The federal charges in this case were filed December 17, 2003. Arrest warrants were issued and defendant was arrested on September 18, 2004 in Florida. He was not transported to Kansas until October 29, 2004. Then he was housed at the CCA facility in Leavenworth, Kansas, but for some reason he was not brought to court for appointment of counsel and his first appearance until January 13, 2005. This was 77 days after he first arrived in Kansas.

Defendant claims that this delay violates his statutory and constitutional speedy trial rights.

The government contends that his statutory speedy trial rights did not begin to operate until defendant first appeared in court in Kansas, which in this case was January 13, 2005. The court agrees. The Speedy Trial Act states: “In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing

date . . . of the information or indictment or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). The seventy-day period for defendant Lyons did not start until he "appeared before a judicial officer" in this district. This did not happen when defendant was transported to Kansas in October 2004; it happened on January 13, 2005. Since that date the provisions of the Speedy Trial Act have been followed. Therefore, there has been no statutory speedy trial right violation. See U.S. v. Kalady, 941 F.2d 1090, 1094 (10th Cir. 1991).

There has been no constitutional speedy trial violation either. The Sixth Amendment right to a speedy trial attaches at the time of arrest. Doggett v. United States, 505 U.S. 647, 655 (1992); U.S. v. Wallace, 326 F.3d 881, 885 (7th Cir. 2003). In evaluating whether the delay of a trial has violated the Constitution, a court must consider the length of the delay, the reason for the delay, the defendant's assertion of his speedy trial rights, and the prejudice to defendant due to the delay. Barker v. Wingo, 407 U.S. 514, 530 (1972). However, the length of delay is given first consideration, and only when the length of delay is presumptively prejudicial should the court consider the remaining factors. The court has not reached the point of

trial in this case, obviously. But, the delays which have occurred since the date of defendant Lyons' arrest in Florida are not so long as to trigger scrutiny under the Sixth Amendment. U.S. v. McFarland, 116 F.3d 316, 318 (8th Cir.) cert. denied, 522 U.S. 961 (1997) (lapse of a little over seven months); U.S. v. Lugo, 170 F.3d 996, 1002 (10th Cir. 1999) (delay of approximately seven months); U.S. v. Dirden, 38 F.3d 1131, 1138 (10th Cir. 1994) (delay of seven and one-half months); U.S. v. Kalady, 941 F.2d 1090, 1095-96 (10th Cir. 1990) (delay of eight months between indictment and guilty plea).

Therefore, the court shall deny defendant Lyons' motion to dismiss.

CONCLUSION

Defendants' motions to suppress and defendant Lyons' motion to dismiss shall be denied.

**IT IS SO ORDERED.**

Dated this 7th day of March, 2005 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge